**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-80153-CIV-COHN**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**DARREN SILVERMAN and MATTHEW BRENNER,**

**Defendants.**

**PLAINTIFF'S MOTION AND MEMORANDUM OF LAW TO SET DISGORGEMENT AND CIVIL PENALTY AMOUNTS AS TO DEFENDANTS DARREN SILVERMAN AND MATTHEW BRENNER**

Plaintiff Securities and Exchange Commission moves the Court for final judgments finding Defendants Darren Silverman and Matthew Brenner jointly and severally liable for disgorgement of $8,117,527 and prejudgment interest of $2,606,739.86, and imposing civil penalties of $120,000 on Silverman and $110,000 on Brenner.

## FACTUAL AND PROCEDURAL HISTORY

The Court has entered Judgments of Permanent Injunction and Other Relief against Defendants Silverman and Brenner (the "Judgments") ordering that the amounts of disgorgement, prejudgment interest, and civil money penalties against the Defendants be determined by the Court upon the Commission's motion (DE 19, 21). The Judgments to which Silverman and Brenner consented both also order that a "Defendant may not, by way of defense to [a motion for disgorgement], challenge or otherwise contest the allegations of the Complaint, which shall be deemed true by the Court for purposes of this motion." (DE 19 at 7; DE 21 at 7). The Judgments require the same for motions to impose civil penalties. *Id*.

Therefore, the only issues for the Court to determine in this motion are the amounts of disgorgement, prejudgment interest, and civil penalties it should order against these two defendants. In support of this motion, the Commission submits the Affidavit of Soneet R. Kapila, a forensic certified public accountant, as Exhibit 1. This declaration evidences the disgorgement the Commission seeks against Silverman and Brenner as the quantity of money which could not be accounted for due to the incomplete and inadequate financial records maintained by Silverman and Brenner at the companies through which they carried out their fraudulent scheme: $8,117,527. The Commission also attaches as Exhibit 2 its calculation of the prejudgment interest on this sum.

**Judgment of Permanent Injunction as to Silverman**

On May 7, 2004, the Court entered a Judgment of Permanent Injunction And Other Relief against Silverman, by consent, enjoining him from future violations of Sections 5(a), 5(c), and 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), and prohibiting him from acting as an officer or director of a public company (DE 19). The Judgment against Silverman further provides:

**DISGORGEMENT**

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Defendant shall disgorge, with prejudgment interest, all ill-gotten profits or proceeds that he received, directly or indirectly, as a result of the acts or courses of conduct described in the Complaint. The dollar amount of disgorgement shall be reached by agreement of the parties or, if the parties are unable to reach agreement, the amount shall be determined by the Court upon the Commission's motion. Defendant may not, by way of defense to such a motion, challenge or otherwise contest the allegations of the Complaint, which shall be deemed true by the Court for purposes of this motion. Nothing in this Judgment shall prevent

> Defendants from presenting evidence regarding the amount of disgorgement sought by the Commission in such motion.
>
> **PENALTIES**
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the amount of civil penalties, if any, that Defendant shall be required to pay pursuant to Section 20(d) of the Securities Act, 15 U.S.C. §77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. §80b-9(e) in connection with the activities described in the Commission's Complaint, shall be determined by the Court upon the Commission's motion. Defendant may not, by way of defense to such motion, challenge or otherwise contest the allegations of the Complaint, which shall be deemed true by the Court for purposes of this motion. Nothing in this Judgment shall prevent Defendant from presenting evidence of factors mitigating against the imposition of a civil penalty, or its amount.

[DE 19 at 6-7]. Thus, the Court has already ordered Silverman to disgorge, with prejudgment interest, all ill-gotten profits or proceeds he received, directly or indirectly, as a result of the acts or courses of conduct described in the Complaint, and pay a civil penalty based on his unlawful conduct.

**Judgment of Permanent Injunction as to Brenner**

On May 7, 2004, the Court entered a Judgment of Permanent Injunction And Other Relief against Brenner, by consent, enjoining him from future violations of Sections 5(a), 5(c), and 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act, and prohibiting him from acting as an officer or director of a public company (DE 21). The Judgment against Brenner further provides:

> **DISGORGEMENT**
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Defendant shall disgorge, with prejudgment interest, all ill-gotten profits or proceeds that he received, directly or indirectly, as a result of the acts or courses of conduct described in the Complaint. The dollar amount of disgorgement shall be reached by agreement of the parties or, if the parties are unable to reach

> agreement, the amount shall be determined by the Court upon the Commission's motion. Defendant may not, by way of defense to such a motion, challenge or otherwise contest the allegations of the Complaint, which shall be deemed true by the Court for purposes of this motion. Nothing in this Judgment shall prevent Defendants from presenting evidence regarding the amount of disgorgement sought by the Commission in such motion.
>
> **PENALTIES**
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the amount of civil penalties, if any, that Defendant shall be required to pay pursuant to Section 20(d) of the Securities Act, 15 U.S.C. §77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. §80b-9(e) in connection with the activities described in the Commission's Complaint, shall be determined by the Court upon the Commission's motion. Defendant may not, by way of defense to such motion, challenge or otherwise contest the allegations of the Complaint, which shall be deemed true by the Court for purposes of this motion. Nothing in this Judgment shall prevent Defendant from presenting evidence of factors mitigating against the imposition of a civil penalty, or its amount.

[DE 21 at 6-7]. Thus, the Court also has already ordered Brenner to disgorge, with prejudgment interest, all ill-gotten profits or proceeds he received, directly or indirectly, as a result of the acts or courses of conduct described in the Complaint, and pay a civil penalty based on his unlawful conduct.

## MEMORANDUM OF LAW

### THE COURT SHOULD ORDER SILVERMAN AND BRENNER TO PAY DISGORGEMENT, PREJUDGMENT INTEREST, AND CIVIL PENALTIES

1. Disgorgement and Prejudgment Interest

Disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978); *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987), *cert. denied*, 486 U.S. 1014 (1988); *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1103-04 (2d Cir.

1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable"). “The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged.” *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997). Where, as here, the fraud is “pervasive,”[1] the Court should order all profits stemming from the scheme to be disgorged. *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986), *cert. denied*, 479 U.S. 853 (1986).

“The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains.” *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). “The SEC's burden for showing the amount of assets subject to disgorgement . . . is light: ‘a reasonable approximation of a defendant's ill-gotten gains [is required] . . . . Exactitude is not a requirement.’” *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (quoting *Calvo*, 378 F.3d at 1217).

“[W]here a defendant's record-keeping or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense, it is well within the district court’s discretion to rule that the amount of disgorgement will be the more readily measurable proceeds received from the unlawful transactions.” *Calvo*, 378 F.3d at 1217-18 (*citing CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1252 (2d Cir. 1986)). *See also SEC v. United Monetary Services, Inc.*, No. 83-8540-CIV, 1990 WL 91812 at *9 (S.D. Fla. May 18, 1990) (ordering securities fraud defendant to disgorge the gross sums received from investors). The wrongdoer, who has created the uncertainty through violations of

[1] For the purposes of this motion, Silverman and Brenner cannot challenge the allegations of the Complaint, which make clear that the entire unregistered offering scheme they ran was a fraud, as set forth in more detail below in Section 2.

the federal securities laws, bears the risk of uncertainty. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946); *Elkind v. Liggett & Myers, Inc*., 635 F.2d 156, 171 (2d Cir. 1980); *SEC v. Bilzerian*, 814 F. Supp. 116, 121-22 (D.D.C. 1993) ("The SEC need only offer a prima facie reasonable approximation; the burden then shifts to defendant to rebut the presumption, and the risk of uncertainty should fall on the wrongdoer.").

The burden then shifts to the defendant to demonstrate the Commission's estimate is not a reasonable approximation. *Calvo*, 378 F.3d. at 1217. In determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party." *SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 727 (D.D.C.1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989).

According to the Judgments to which Silverman and Brenner consented, the Complaint's allegations are deemed true for purposes of this motion, so Silverman and Brenner cannot dispute they orchestrated a fraudulent offering and sale of unregistered securities that bilked investors out of approximately $33 million. Because the extensive problems with the Defendants' record-keeping prevented the Commission and its forensic accountant from identifying what funds went to Silverman and Brenner, the Commission, as explained below, now seeks disgorgement of the entire sum of unaccounted money disbursed by the scheme: $8,117,527.

2. <u>The Complaint's Allegations Against Silverman and Brenner</u>

On February 19, 2004, the Commission filed a Complaint against Silverman and Brenner, alleging they had violated the federal securities laws through their fraudulent offering and sale of unregistered securities issued by IDT Funds and IDT Group, Inc. ("IDT Group"). (DE 1 at ¶1). The following allegations of the Complaint are deemed admitted for purposes of this motion: from August 1999 through May 2002, Silverman and Brenner defrauded hundreds of investors

out of approximately $33 million through the offer and sale of securities issued by five individual affiliated hedge funds (collectively "IDT Funds") and, beginning in 2001, shares in IDT Group. *Id*.

Silverman and Brenner used deceptive offering materials and fictitious statements to entice individuals to invest in the hedge funds. *Id.* They then lulled investors into keeping their funds invested and making additional investments by sending them account statements falsely stating the IDT Funds were profitable and outperforming major market indicators. *Id.* They also misrepresented the safety of investments in IDT Funds, while lying to investors about the compensation IDT Funds paid their day traders. *Id.* Silverman and Brenner misled investors by paying them what they claimed were "dividends" but, in truth, were new investor funds paid to earlier investors in a Ponzi-like fashion. *Id.*

At Silverman and Brenner's direction, both IDT Funds and its successor, IDT Group, employed unlicensed sales representatives who raised millions of dollars from investors, including more than $3 million from religious non-profit organizations. *Id*. The IDT Funds offered and sold their investments to the public through a network of sales representatives whom Silverman and Brenner directed. *Id*. at ¶9. Silverman and Brenner, and the IDT Funds sales representatives at their direction, made numerous material misrepresentations and omissions to convince investors to invest, or continue investing, in IDT Funds and, eventually, its successor, IDT Group. *Id*. at ¶12.

In March 2001, Silverman and Brenner, and sales representatives at their direction, began telling investors that they were merging the IDT Funds to form another, single entity called IDT Group. Silverman and Brenner told investors, or directed IDT Fund sales representatives to tell investors, that IDT Group was expanding its offices and staff (including hiring additional day-

traders), as well as offering additional services, even though Silverman and Brenner knew, with one very minor exception, the IDT Funds had been losing money. *Id.* at ¶23. Silverman signed and directed IDT Funds or IDT Group to send investors a document entitled IDT Group, Inc. Confidential Documentation Regarding Merger Plan, ("Merger Plan"), requesting investors to sign an agreement supporting the merger. The Merger Plan ostensibly allowed each limited partner to convert his or her limited partnership interest, or shares of IDT Venture stock into shares in IDT Group stock, with the same valuation. *Id.* at ¶24.

Silverman, Brenner, and sales representatives at their direction, told unwilling investors they had "no choice" regarding the merger, falsely stating that "over 50% of the investors already signed." *Id.* at ¶25.

Brenner falsely represented to at least one investor that 80 to 85 percent of investors had agreed to the Merger Plan, and none had dissented. Some investors were not informed of the merger until after the fact. *Id.* Brenner falsely told at least one investor that the IDT Group would become a public company within 6-18 months of the merger. *Id.* Silverman and Brenner orchestrated the merger of IDT Funds' five individual hedge funds into IDT Group between April 24 and July 31, 2001. *Id.* During the merger process, they failed to disclose to investors that the IDT Funds were not profitable and had, in fact, sustained serious trading losses. *Id*

Once the IDT Funds merged into IDT Group, more than $18 million of the $26,284,575 the IDT Funds had raised transferred to IDT Group, with the difference comprising more than $6 million in losses and more than $1.2 million in redemptions. *Id.*

These additional allegations against Silverman are admitted for purposes of this motion:

- On May 1, 2001, he directed IDT Group to commence its own private placement, offering 3 million shares of its common stock at $10 per share to investors. *Id.* at ¶31. IDT Group raised approximately $6.8 million in this offering. *Id.* Maintaining the illusion of profitability and successful management of the investments and the IDT companies,

Silverman sent correspondence to investors acknowledging their investments and signed all IDT Group stock certificates. *Id.*

- Beginning in April 2002, Silverman presided over IDT Group's distribution to investors of a "stock purchase agreement," asking them to exchange all their outstanding IDT Group stock for stock in a company called BrandAid. *Id.* at ¶34. Silverman, or IDT Group sales representatives at his direction, told investors they were receiving an "incredible deal," getting BrandAid stock at a "huge discount." *Id.* When investors balked at approving the stock exchange, Silverman, or IDT Group sales representatives at his direction, lied and told them more than 50% of IDT Group's current shareholders had already agreed to the exchange, and if they held out, they would have only "worthless" stock in a "shell company." *Id.*

- Silverman directed IDT Group to mail and fax investors financial projections reflecting that IDT Group expected net earnings of approximately $7.5 million, $27.1 million, $55 million and $90 million for the years 2002, 2003, 2004, and 2005, respectively, even though he knew IDT Funds had a dismal investment record and IDT Group had no basis for these projections. *Id.* at ¶32.

- Silverman further misrepresented IDT Group's status in its PPM by falsely claiming that Worldwide Trading, LLC ("Worldwide") – which IDT Group purportedly planned to establish as its own broker-dealer – had applied in April 2000 for NASD and Philadelphia Stock Exchange memberships when, in fact, Worldwide never applied for those memberships. *Id.* at ¶33.

Similarly, based on the Complaint's allegations, neither Silverman nor Brenner can dispute that:

- IDT Funds, at the direction of Brenner, and later Silverman, sent investors account statements falsely representing that IDT Funds were profitable and outperforming all major market indicators, when the funds actually were losing money. Silverman and Brenner used this information to convince earlier investors to increase their investments in IDT Funds. *Id.* at ¶13.

- They and IDT Funds representatives they directed falsely represented IDT Funds as a safe and better alternative to traditional mutual funds. Brenner told investors the funds were "very conservative" and would "profit in all market conditions." *Id.* at ¶16.

- Silverman and Brenner, and IDT Funds' sales representatives at their direction, told investors IDT Funds engaged in low-risk trading activities, even though they knew this to be false. *Id.* at ¶17.

- Brenner told investors that IDT Funds employed the "best day traders in the business," many of whom left "prestigious Wall Street firms" to work for IDT Funds, when he knew that many of IDT Funds' and IDT Group's principals and traders had adverse disciplinary, criminal, and regulatory histories. *Id.* at ¶20.

The Complaint, therefore, provides an ample factual basis for the Court to award the Commission's requested disgorgement, prejudgment interest, and civil penalty relief.

3. Amount of Disgorgement and Prejudgment Interest

The Commission's forensic accounting expert has found that the severely inadequate financial records from Silverman and Brenner's companies have made it impossible to identify what happened to $8,117,527 the fraud raised from investors. Ex.1 at ¶¶ 17-19, 21, 24-25. The dearth of financial records appears to mask what money Silverman and Brenner actually took personally from the fraud, since the records the accountant is able to reconstruct make it appear, improbably, as if the Defendants took virtually nothing from the scam. *Id*. at ¶¶ 23-25. Resolving any doubts about the amount of disgorgement against Silverman and Brenner, as the law says the Court must, it seems likely this unaccounted-for $8.1 million comprises the ill-gotten gains Silverman and Brenner directed to themselves or for their benefit. *Id*. While the Commission could seek the entire amount the fraud raised as disgorgement against these defendants, whose faulty record-keeping has obstructed the disgorgement determination,[2] here we have narrowed the amount we seek to only the amount of unidentified payments.

The Court should therefore order Silverman and Brenner to disgorge this amount. Joint and several liability is appropriate, since Silverman and Brenner worked together to implement and run the IDT fraud. *Calvo*, 378 F.3d at 1215 (citations omitted). So is prejudgment interest.[3] For cases in which a securities law violator has enjoyed access to funds over a period of time as a result of his or her wrongdoing, requiring the wrongdoer to pay prejudgment interest is consistent with the equitable purpose of the remedy of disgorgement. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997). Defendants' wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental

[2] *Calvo*, 378 F.3d at 1217-18.

[3] Both Judgments provide that Silverman and Brenner shall pay pre-judgment interest on the amount they must disgorge (DE 19 at 7; DE 21 at 7).

fairness. *Tome*, 638 F. Supp. at 639. In the context of Section 10(b) and Rule 10b-5 actions, such as the case at bar, proof of a defendant's scienter is sufficient to justify an award of prejudgment interest. *Rolf v. Blyth*, 637 F.2d 77, 87 (2d Cir. 1980).

Pursuant to the Judgments, the Commission calculated pre-judgment interest in accordance with the delinquent tax rate established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis, from February 19, 2004 - when the Commission filed its Complaint - to the filing of this motion. Based on the principal amount of $8,117,527 in ill-gotten gains for which Silverman and Brenner are responsible, application of that rate results in a total prejudgment interest amount of $2,606,739.86, for a total disgorgement and prejudgment interest payment of $10,724,266.86. *SEC v. Poirier*, 140 F. Supp.2d 1033, 1047 (D. Ariz. 2001). The Commission attaches its Prejudgment Interest Report as Exhibit 2.

4. The Court Should Impose Civil Penalties of $120,000 and <u>$110,000, Respectively, Against Silverman and Brenner</u>

The Commission seeks civil penalties of $120,000 against Silverman and $110,000 against Brenner, pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act, each of which establishes the same three tiers of potential penalties. Under the First Tier for both statutes, the court may impose a penalty of up to (i) $5,000 on an individual defendant for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation. Under the Second Tier, the Court may impose a penalty of up to (i) $50,000 on an individual defendant for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation. The Second Tier applies where the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. Finally, under the Third Tier the Court may impose a penalty of up to (i) $100,000 on an individual defendant for each violation or (ii) the gross amount of pecuniary gain to the

defendant as a result of the violation.[4] *SEC v. KS Advisors, Inc*., No. 2:04-CV-105-FTM-29, 2006 WL 288227 at *3 (M.D. Fla. Feb. 6, 2006). The Third Tier applies to cases in which the requirements of a Second Tier penalty are present *and* the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

Silverman and Brenner merit their respective Third Tier penalties because based on the Complaint's allegations, which the Court must deem true for purposes of this motion, their conduct involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Meadows v. SEC*, 119 F.3d 1219, 1228 (5th Cir. 1997). *See also SEC v. Friendly Power Co. LLC*, 49 F. Supp.2d 1363, 1373 (S.D. Fla. 1999) (imposing third tier penalties because, among other things, defendants' failure to register their securities with the Commission created a substantial risk the investors would lose their investments); *SEC v. Hilker*, No. 03-CV-01338, 2007 WL 174091 at *3 (D. Colo. Jan. 18, 2007) (court imposed third tier civil penalties based on complaint's allegation that defendants' fraudulent conduct created a significant risk of substantial losses to investors).

Silverman and Brenner managed the IDT Funds, directed and oversaw the IDT Funds' merger into IDT Group, and were involved in IDT Group's operations at the highest levels. Complaint at ¶4. They controlled, or had the power to control, IDT Funds and IDT Group's sales representatives' conduct, and the content of the entities' marketing materials, private placement memoranda, and website. *Id.* Essentially they ran the IDT fraud. As demonstrated

[4] These numbers are based on the Federal Civil Penalties Inflation Adjustment Act of 1990, which adjusted the potential penalty amounts to account for inflation, based on violation dates. 17 C.F.R. Pt. 201, §§ 201.1001-1002, Tbl. II to Subpt. E, 66 FR 8761 at * 8662-63. Therefore, Silverman is subject to a $120,000 penalty because the majority of his violations occurred between February 3, 2001 and February 14, 2005, while Brenner is subject to a $110,000 penalty because the majority of his violations occurred between December 10, 1996 and February 2, 2001.

above, Silverman and Brenner misled investors about, among other things: (1) the growth and rates of return on the touted investments; (2) the safety of the investments; (3) the compensation structure for IDT Funds' and IDT Group's traders; and (4) their experience as well as the experience of others involved in running the IDT Funds, and its successor, IDT Group. *Id.* at ¶12. They defrauded hundreds of investors out of approximately $33 million. *Id.* at ¶1. Consequently, the Court should order Silverman and Brenner each to pay Third Tier civil penalties.

## CONCLUSION

**WHEREFORE**, the Commission respectfully requests that the Court enter: (1) a Final Judgment against Silverman and Brenner, finding them jointly and severally liable for disgorgement of $8,117,527, plus prejudgment interest of $2,606,739.86, for a total disgorgement payment of $10,724,266.86, and ordering Silverman to pay a Third Tier $120,000 civil penalty and Brenner to pay a Third Tier $110,000 civil penalty. We have submitted a proposed Final Judgment with this motion.

## CERTIFICATION OF COMPLIANCE WITH RULE 7.1.A.3, S.D. FLA. L.R

Counsel for the Commission conferred with Silverman and Brenner's counsel in an attempt to resolve the matters raised in this motion, but was unable to do so.

Date: June 25, 2008.

Respectfully submitted,

By: s/ Scott A. Masel

Scott A. Masel
Senior Trial Counsel
Florida Bar No. 0007110
Telephone: (305) 982-6398
e-mail: masels@sec.gov

SECURITIES AND EXCHANGE COMMISSION

801 Brickell Avenue

Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154

*Attorney for the Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 25, 2008 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Scott A. Masel
Scott A. Masel, Esq.

## SERVICE LIST

Securities and Exchange Commission v. Darren Silverman and Matthew Brenner
Case No. 04-80153-CIV-COHN/SNOW
United States District Court, Southern District of Florida

David Feingold, Esq.
Feingold & Kam
3300 PGA Blvd., Suite 410
Palm Beach Gardens, FL 33410
Telephone: (561) 630-6727
Fax: (561) 630-8936
Email: david@fkfirm.com
Counsel for Defendants
*Service by CM/ECF*

s/ Scott A. Masel
Scott A. Masel, Esq.